# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                    Criminal Action No. 5:11-cr-32

DAWANTAYE BOSWELL,

      Defendant.


## REPORT AND RECOMMENDATION DEFENDANT'S MOTIONS TO SUPPRESS BE DENIED

This matter comes before the Court on Defendant's Motion to Suppress Evidence filed on August 20, 2011,[1] and Defendant's Motion to Suppress Out-of-Court Identifications as Unnecessarily Suggestive and Unreliable, and Motion to Suppress Any Subsequent In-Court Identification.[2] The Court held an evidentiary hearing and argument on Defendant's Motions to Suppress on November 2, 2011. Defendant appeared in person and by his counsel Jay T. McCamic, in person. The United States of America (hereinafter "the Government") appeared by John C. Parr, in person. Defendant tendered the testimony of officers Robert Safreed, Neil Fowkes, Jason Chambers, Garrett Pugh, Craig Krimer, Gregory Harris, and David Gittings. The Government did not call any additional witnesses. At the hearing, the Court admitted Exhibit one submitted by Defendant, which is a map of the 500 to 700 blocks of Main Street and the surrounding area. The Court admitted the following exhibits submitted by the Government: a

---

[1]Dkt. No. 23.

[2]Dkt. No. 24.

photograph of Defendant's bathroom as Exhibit one, a photograph of the crack cocaine found in Defendant's bathroom as Exhibit two, a photograph of the jar of marijuana found in Defendant's bathroom as Exhibit three, and a map provided by the city engineer's office of the 500 to 700 blocks of Main Street with distances to protected locations indicated as Exhibit four. No other testimony was taken nor was any other evidence adduced.

## I. **Introduction**

A.    Background

Defendant was indicted in Count One of possession with intent to distribute more than 280 grams of cocaine base within 1,000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 860, and in Count Two of establishment of manufacturing operations in violation of 21 U.S.C. § 856(a)(2). Defendant now moves this Court to suppress evidence and to suppress out-of-court identifications and any subsequent in-court identification.

B.    The Motions

> 1.    Motion to Suppress Evidence
>
> 2.    Motion to Suppress Out-of-Court Identifications as Unnecessarily Suggestive and Unreliable, and Motion to Suppress Any Subsequent In-Court Identification

C.    Recommendation

I recommend Defendant's Motion to Suppress Evidence be **DENIED** because the evidence was obtained through the officer's good faith reliance on the search warrant. I recommend Defendant's Motion to Suppress Out-of-Court Identifications as Unnecessarily Suggestive and Unreliable, and Motion to Suppress Any Subsequent In-Court Identification be **DENIED** because the totality of circumstances indicates the identification did not create a likelihood of misidentification.

## II. Facts

A.      The Events on July 8, 2011

At around 4:00 a.m. on July 8, 2011, officers responded to reports that shots had been fired at 17 7th Street in Wheeling, West Virginia. Officers encountered Dawn Hanna and Danell Morris at the residence. Ms. Morris told officers that Jerome Ross and Marquis Bass had come to the residence and were counting their money when a black male entered the residence and demanded money. At some point during the encounter, the assailant struck Mr. Ross with the butt of his gun, causing the gun to discharge and the bullet to lodge in the bathroom wall. Ms. Hanna, the mother of Richard Hall and Marquis Bass, told police she had seen the assailant fleeing from the house. She reported to Sargent Kriner she did not know the assailant's name but that she recognized him from the neighborhood. She described him as a dark-skinned black male with braids who was carrying a dark-colored gun, and stated that she could likely identify him.

Jerome Ross had fled to his sister's house at 524 Lane B in Wheeling, West Virginia, afer being struck. When officers encountered him there, bleeding from the face, he reported that a black male had entered his bedroom and demanded money, and that at some point during the scuffle, he was "gun-butted" by the assailant. Although Mr. Ross reported varying sums of money taken, the assailant allegedly walked away with between $500 and $12,000 in a synch bag. While Mr. Ross originally maintained that he did not know Defendant, but he later told officers that his name was Dawantaye. Officer Fowkes testified at the hearing that Mr. Ross stated they were not friends but they were associates. Hr'g Tr. ___.

Later in the investigation that morning, Sargent Kriner retrieved the shell casing and the bullet lodged in the bathroom wall. Officers also found a black magazine containing .380 bullets

behind the front door. Later that morning, a neighbor also found a firearm in his backyard, although it is unclear if it is the weapon allegedly used by Defendant. Finally, Detective Harris testified that money was found in a neighbor's backyard, although it is not clear if this is connected to the crime.

B.      The Identifications

Responding to information about the alleged robbery and gun fire, officers stopped three males on the street at around the 500 or 600 block of Main Street, who were later identified as Defendant, Richard Hall, and Marquis Bass. When officers asked what Defendant was doing on the street, he said he had just left his house. Richard Hall and Maquis Bass said that they were out to meet up with some girls when they had coincidentally run into Defendant on the street, who was talking about how he had just been robbed.  Connecting the two events together and believing that Mr. Ross could positively identify the assailant, after officers were finished interviewing Mr. Ross, they placed him in the back of their squad car and drove him to around the 500 or 600 block of Main Street where the three individuals had been stopped by police. From the back of the squad car and with the spotlight on the group of three individuals, Mr. Ross identified Defendant as the one who had taken his money and struck him with the gun. Police also brought Ms. Hanna to the area. From the front passenger seat of the squad car, she picked out Defendant as the man she had seen with the gun in her house, although the two other men standing with Defendant were her sons.

C.      The First Application for a Search Warrant and its Execution

After analyzing the information noted above, Detective Harris applied for a warrant to search Defendant's residence at 514 Main Street, Apartment 101, Wheeling, West Virginia, from

Magistrate Joseph Roxby in Ohio County. In relevant part, the affidavit stated:

> On Friday, July 8, 2011, Officers responded to 17 7th St., to a shots fired call. Upon arrival, officers were advised that (1) male subject, Jerome Ross, stated that he had been "gun butted" by a black male named Dawantaye Boswell. Ross stated that he was laying down in the upstairs bedroom when Dawantaye came upstairs and pointed a gun, grey or black in color, at him and said to give him everything he had. Jerome stated that he then jumped up and Dawantaye struck him in the face with the gun and fired a shot. I, Det. Harris, was able to locate (1) bullet lodged in the wall of the bedroom that went into the bathroom wall. Jerome also stated that Dawantaye stole approx. $12,000 from him that was located in a "synch bag." Officers found Dawantaye near his apartment at 514 Market St., Apt. 101 and placed him under arrest.

The search warrant also went on to list the evidence that Detective Harris was looking for, including firearms, magazines, bullets, bullet casings, anything associated with firearms, or money. At the hearing, Detective Harris confirmed that this was the only information that Magistrate Roxby was presented with when making his determination as to whether there was probable cause to issue a search warrant. Magistrate Roxby then went on to sign the search warrant in the Detective's presence. During the search, executed by Detective Harris, he saw in Defendant's bathroom, in plain view, crack cocaine, marijuana, and digital scales, among other items, that would indicate Defendant is involved in drug dealing and manufacturing.

D.      The Second Application for a Search Warrant and its Execution

As a result of discovering the drugs and other drug paraphernalia in Defendant's apartment, Detective Harris contacted Detective Gittings with the Ohio Valley Drug Task Force. After coming to the location on Main Street, Detective Gittings applied for a state search warrant from Ohio County Magistrate Roxby. Once Magistrate Roxby signed the warrant, Detective Gittings and other officers with the Ohio Valley Drug Task Force returned to the apartment to execute the warrant, and seized 408 grams of crack cocaine, marijuana, and other items. These

seizures during execution of the second warrant form the basis for the instant federal charges.

### III.      Motion to Suppress Evidence

A.      Contentions of the Parties

Defendant contends that the evidence seized pursuant to the second search warrant should be suppressed because it was discovered as a result of the first search warrant, which was not supported by probable cause and demonstrated no nexus between the robbery and Defendant's apartment. Defendant argues there is no nexus because all the warrant alleges is that Defendant "gun butted" Mr. Ross and stole $12,000, but the warrant makes no attempt to connect these events to Defendant's apartment. Furthermore, Defendant argues the warrant lacks probable cause because the facts presented in the affidavit distill down to the fact that officers were investigating a robbery, the victim alleged Defendant was the perpetrator, and Defendant was arrested for the robbery near his apartment. Defendant alleges this information is not enough to form probable cause, and in fact that it is so little information that officers could not have believed it formed the basis for a valid warrant under the good faith exception

The Government contends that regardless of whether the warrant was based on probable cause, it is clear that officers executed the warrant in good faith. Based on the facts as stated, officers had reason to believe that he was the assailant, that he had returned to his home after the robbery, and that needed to look for evidence of the crime in his apartment because they were not able to confirm the gun, casing, bullet, or money found was connected to the crime.

B.      Discussion

When a Fourth Amendment violation occurs, such as the seizure of evidence on the basis of a warrant that may have lacked the probable cause necessary for its issuance, such a violation does

not automatically mandate exclusion of the evidence.[3] In United States v. Leon, 468 U.S. 897

(1984), the Supreme Court ruled that the Fourth Amendment does not require the exclusion of

illegally obtained evidence so long as the officers who obtained and executed the warrant had

"reasonable grounds for believing that the warrant was properly issued." Id. at 923. However, an

---

[3]This Court make no conclusion of law on the issue of probable cause, because the good faith exception would apply regardless of the Court's decision on the issue. See United States v. DeQuasie, 373 F.3d 509, 520 (4th Cir. 2004); United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004). However, while probable cause is a concept that eludes any specific definition, see United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010), it has been said that in order for probable cause to exist, there must be a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983). The determination of whether probable cause exists on the face of a warrant affidavit must be made by a "neutral and detached magistrate" on the basis of adequate supporting facts and circumstances contained in the officer's statement. Johnson v. United States, 333 U.S. 10 (1948). It is also well-settled that "the fact that there is probable cause to believe that a person has committed a crime does not automatically give the police probable cause to search his home for evidence of that crime. United States v. Freeman, 685 F.2d 942 (5th Cir. 1982). See also United States v. Haynes, 301 F.3d 669 (6th Cir. 2002)(where defendant was suspected of stealing firearms and jewelry, and was not arrested at or near his car, and there was no other evidence showing a fair probability contraband would be found there, no probable cause to search the vehicle existed); United States v. Edwards, 242 F.3d 928 (10th Cir. 2001)(where defendant was arrested for robbery in front of the bank with a bag containing $2,000, no probable cause existed to search his car). However, as the court in United States v. Jones noted, "if there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." 994 F.2d 1051, 1055-56 (3rd Cir.1993).

In this case, the affidavit reflects the fact that a gun had been used by the assailant, that he had stolen money during the course of the crime, and that he had been stopped by police near the scene of the crime. Some courts have been more willing to infer a kind of connection even where little nexus is demonstrated, see Jones, 994 F.2d at 1056 ("cash is the type of loot that criminals seek to hide in secure places like their homes" and that other items like firearms are also the "type[ ] of evidence likely to be kept in a suspect's residence."); United States v. Hendrix, 752 F.2d 1226, 1231 (7th Cir. 1985)("it was likely that they would conceal the cash in the apartment rather than in some less secure and accessible place). However, here, the warrant affidavit made no effort to tie the residence to the criminal items sought The affidavit did not indicate Defendant spent any time at his residence that night, nor did it indicate what criminal conduct would be established by searching Defendant's residence. Without any connecting phrases to demonstrate a nexus between the items sought and Defendant's residence, the mere assertions in the warrant affidavit likely are not enough to show the requisite connection.

officer cannot be said to have had reasonable grounds for believing a search warrant was valid if "the affidavit is so lacking in probable cause as to render the officer's belief in it entirely unreasonable" or if "the warrant was so facially deficient that the executing officer could not have assumed it was valid." Leon, 468 U.S. at 922. When making a decision on whether the officer's reliance on the warrant was reasonable, the court is permitted to consider not just the facts on the face of the affidavit, but also the totality of information that may have influenced the officer. United States v. Perez, 393 F.3d 457, 462 (4th Cir. 2004); United States v. Legg, 18 F.3d 240, 243-44 (4th Cir. 1994). The question here, then, is whether it was "objectively reasonable" for the officers who obtained and executed the search warrant to assume that the person issuing it had constitutional grounds to do so. See e.g., United States v. Malveaux, 350 F.3d 555 (6th Cir. 2003).

In this case, the warrant was not clearly, facially deficient for lack of probable cause, so the evidence seized pursuant to the second warrant, seen in plain view while executing the first, falls under the good faith exception. Here, Detective Harris testified that he personally reviewed the officers' reports about the events of July 8, 2011. He also testified that  he personally went to the scene to investigate, and that he found evidence to corroborate what was in their reports– he found a bullet hole in the bathroom and blood spatter in front of the house, and the found shell casing had also been turned over to him. He testified that he analyzed all the information he had gathered back at headquarters and then made the decision to write a request for a search warrant. Although he states that he knew a gun, a magazine, a bullet, a bullet casing, and some money had already been recovered, he could not know for sure, and still does not, whether any of those pieces of evidence were connected to Defendant, so at the point he requested the warrant, he was still searching for the gun that fired the particular shell casing and the missing money.

Detective Harris also testified to the actual signing of the warrant. He stated that he did not seek out Magistrate Roxby; he was just the only magistrate in the office when he arrived. He knew that Magistrate Roxby had rejected other search warrants and would also send warrants back to officers to change the affidavit or to include more information. Hr'g Tr. ___. He knew that only truthful information could be lawfully included in the warrant affidavit and he did not believe he had provided any false information. Hr'g Tr. ___. Therefore, as he testified, Officer Harris had no reason to believe he did not have a valid search warrant when the magistrate signed it. Hr'g Tr. ___. Accordingly, this Court finds that Officer Harris acted in good faith on a court-issued warrant, so the evidence found pursuant to the second warrant is not fruit of the poisonous tree, and this court therefore recommends that Defendant's Motion to Suppress Evidence be denied.

**IV.** **Motion to Suppress Out-of-Court Identifications as Unnecessarily Suggestive and Unreliable, and Motion to Suppress Any Subsequent In-Court Identifications**

A.    Contentions of the Parties

Defendant contends that the out-of-court identifications were impermissibly suggestive and unreliable in the context of all the circumstances. With respect to Mr. Ross' identification, Defendant argues it is unreliable because he gave the police conflicting versions of the events, changing the amount of money he claims was taken and his relationship with Defendant. With respect to Ms. Hanna's identification, Defendant contends that she did not have the opportunity to see the assailant clearly or for a long period of time, that the only other individuals surrounding Defendant were her sons, causing her to identify him by elimination, and that he previous description of the assailant does not match is physical description.

The Government contends that the "show up" identifications made by two separate witnesses were not the product of impermissibly suggestive techniques, and that even if so, Defendant cannot

meet his burden of proving the identification was unreliable in consideration of all the other circumstances. The government argues that because of the witnesses' opportunity to view the suspect, their degrees of attention, the accuracy of their descriptions, their lack of uncertainty in the identification, and the length of time between the crime and the identification, their out-of-court identifications are reliable.

B.    Discussion

The Court must decide whether the two identifications, the one made by Mr. Ross and the one made by Ms. Hanna, violated Defendant's due process rights, and whether admitting subsequent in-court identifications would also violate constitutional standards. Defendant has the burden of first showing that the "showup" identification procedure used was impermissively suggestive. If Defendant is able to meet this burden, the he must next prove that the identification is also unreliable under a totality of circumstances approach. Manson v. Brathwaite, 432 U.S. 98 (1977). If both can be proven, then the Court will suppress the identification evidence where there is a "very substantial likelihood of misidentification." Harker v. Maryland, 800 F.2d 437, 443 (4th Cir. 1986).

Many courts have treated showups hesitantly because of the possibility for suggestiveness, see Stovall v. Denno, 388 U.S. 293, 302 (1967), and this Court finds there was a level of suggestiveness in the identification procedure. However, this does not end the inquiry. Even though suggestive, an identification can still be reliable if the witness had the opportunity to view the suspect at the time of the crime; if they paid a high degree of attention at the time of viewing the suspect; if they demonstrate accuracy in their prior descriptions; if they express a high level of certainty in the identification; and if there is a short length of time between the crime and the identification. Neil v. Biggers, 409 U.S. 188, 199-200 (1972). The Court finds that in considering

all of these factors, there is no substantial likelihood of misidentification.

Here, first and foremost, this is not a case involving an unknown assailant. Both Ms. Hanna and Mr. Ross have had numerous previous occasions to view Defendant, either from the neighborhood or from working together as "associates." Both stated his face was known to them, so it is not hard to imagine that they would each need to view his face for only a few moments in order to be able to confirm his identity. Similarly, since his face was already known to them, they would not need to focus on his face with the same degree of attention in order to be able to confirm his identity. But even so, victims in general also have a greater incentive to observe and take note of the appearance of assailants, United States v. Saunders, 502 F.3d 384, 392 (4th Cir. 2007), and in this case, both Ms. Hanna and Mr. Ross had such an incentive to closely observe Defendant. Additionally, there is no evidence in the record of any uncertainty with regard to the man Ms. Hanna and Mr. Ross selected as the perpetrator. Although there is some dispute as to whether Ms. Hanna's description of the assailant matched, neither she nor Mr. Ross expressed anything other than firm conviction that this was the man who had been at the residence. Hr'g Tr. ___. Finally, only thirty minutes had elapsed between the time of the crime and the identifications, so this factor as well weighs in favor of the identifications' reliability. Based on the foregoing, this Court concludes the identifications are reliable and recommends that Defendant's Motion to Suppress the out-of-court identifications should be denied. In addition, because the identifications were constitutionally proper, subsequent in-court identifications would not be tainted by the earlier identifications. Accordingly, this Court recommends that Defendants request to suppress subsequent in-court identifications be denied.

**V.      Recommendation**

I recommend Defendant's Motion to Suppress Evidence be **DENIED** because the evidence was obtained through the officer's good faith reliance on the search warrant. I recommend Defendant's Motion to Suppress Out-of-Court Identifications as Unnecessarily Suggestive and Unreliable, and Motion to Suppress Any Subsequent In-Court Identifications be **DENIED** because the totality of circumstances indicates the identification did not create a likelihood of misidentification.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 7, 2011

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE